UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| REGINALD CRAIG, | ) |
|     Plaintiff | ) ) ) |
| v. | )   Case No.: _____ ) |
| FLEET ONE, LLC<br>d/b/a/ WEX FLEET ONE, | )   JURY DEMAND ) ) |
|     Defendant. | ) ) ) |

## COMPLAINT

Comes now Plaintiff Reginald Craig, by and through counsel, and for his complaint states as follows:

### PARTIES

1. Plaintiff Reginald Craig is a resident of White House, Tennessee. He is fifty-four (54) years old and an African-American male.

2. WEX, Inc., formerly Wright Express, is a Delaware corporation with its principal place of business in the state of Maine.

3. WEX, Inc. provides payment solutions for business by providing commercial and government fleet cards to pay for and track vehicle fuel and maintenance services. WEX, Inc. primarily served local fleets, which are commercial vehicles that travel to and from a fixed base each day.

4. Fleet One, LLC primarily served over-the-road ("OTR") fleets, consisting of larger trucks that remain away from the home base overnight for extended periods of time.

5. In October of 2012, WEX, Inc. purchased Fleet One, LLC, a company with its principal place of business in Davidson County, Tennessee and thereafter began doing business in this District as WEX Fleet One. Fleet One, LLC is a wholly-owned subsidiary of WEX, Inc. WEX Fleet One employs over 250 full-time employees.

## ADMINISTRATIVE REMEDY EXHAUSTED

6. Plaintiff has complied with all conditions precedent to jurisdiction under 42 U.S.C. §§ 2000e-5. Plaintiff was unlawfully terminated from employment on September 17, 2013 and timely filed a charge with the EEOC on September 30, 2013. A Notice of Right to Sue was published on August 8, 2014, and this Complaint was filed within ninety (90) days of receipt of the Notice. A copy of the Notice is attached to this Complaint as "Exhibit A."

## JURISDICTION AND VENUE

7. Plaintiff's claims are brought pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§2000 *et seq.*), and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a)(1), and federal questions are therefore presented under 28 U.S.C. § 1331.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant WEX Fleet One is headquartered within this District, and the events or omissions complained of occurred within this District.

## ALLEGATIONS OF FACT

9. Plaintiff Reginald Craig was hired by Fleet One as an account executive for inside sales in 2006. Plaintiff's performance evaluations reflect that he was a solid performer, and in 2009, Plaintiff was given a performance rating of "outstanding."

10. Plaintiff was offered the position of Sales Manager in 2009, but initially declined the Defendant's offer.

11. The position of Sales Manager was again offered to Plaintiff on September 20, 2010, and he accepted. The position was later referred to as "Team Lead, Local Inside Sales."

12. Plaintiff is the only African-American sales manager in the history of Fleet One, and was the most successful manager in the history of the company.

13. Plaintiff and Alex Helton reported to the same supervisor, Jim Pivo. They were subject to the same performance evaluation standards and both were employed as Sales Managers/Team Leads by the Defendant.

14. In 2010, Plaintiff's experience and leadership brought in effective sales strategies and techniques. Plaintiff's techniques resulted in his team's sales numbers and gallon sales gowth.

15. In 2010, Manager Jim Pivo approached Plaintiff and requested that he share his sales "secrets" with Alex Helton. Plaintiff complied with this request, even though Alex Helton's team competed with Plaintiff's team for numbers used in

3

performance evaluations. Plaintiff's "secrets" included methods he had developed while employed as a sales representative. One highly effective technique was to call the "QTS database," which consisted of companies with transportation authority to run inside and outside of the state. This technique yielded unprecedented growth for the Defendant. The Defendant's representatives use this technique to this day.

## DISPARATE TREATMENT

16. After Plaintiff shared his techniques with Alex Helton, she and Jim Pivo started having private meetings from which Plaintiff was excluded.

17. Team Leads are given "territories" for soliciting business that are set up by area code. If a sales representative from one team solicits business from the territory of another, they are required to split the sale, which is known as "splitting leads."

18. Jim Pivo told Plaintiff that he could not "break up" territories. However, Alex Helton was nonetheless allowed to break up territories, and received at least two (2) area codes from one of Plaintiff's former team members. Pivo gave no explanation, despite Plaintiff's repeated requests.

19. In 2011, after being with the Defendant for one year, the Plaintiff and his team caused the Defendant's company to grow twenty-seven percent (27%).

20. In 2011, Plaintiff started having regular sales meetings with his team, and was the only Team Lead in the building to do so. Plaintiff invited all sales representatives, even those not on his team. At these meetings, Plaintiff conducted training seminars for these sales representatives. Pursuant to Plaintiff's training, one of

4

Plaintiff's team members, Jamie Nash, produced 30,000 gallons of new company sales in the first month, which was a new company sales record.

21. Employees are subject to performance reviews based on certain criteria. An employee who receives below a 3.0 on a performance review for two years in a row is subject to dismissal.

22. Plaintiff's team was the highest producing team in the building. However, Jim Pivo scored Plaintiff below a 3.00 on his performance review for 2011. Alex Helton received a 3.2, approximately a full point above Plaintiff. Jim Pivo's stated reason for giving Plaintiff below a 3.0 was because Plaintiff "did not hit his numbers." Alex Helton received over a 3.0 when her sales team produced lower numbers than Plaintiff's team had produced.

23. Despite Plaintiff being the only Team Lead in the building to offer regular training to his team, Pivo scored Plaintiff below a 3.0 in the "leadership" category. Alex Helton did not conduct regular training seminars for her team members.

24. At some point in 2011, Jim Pivo began making disparaging remarks about Plaintiff to Andy Roberts, the President of the company.

25. At some point in 2011, Pivo began placing written reprimands into the Plaintiff's employee file without advising Plaintiff. The company's standard employment practice was to give a verbal warning prior to a written reprimand. Other employees who were white or younger were given verbal warnings before written reprimands were placed in their file. Plaintiff was never given any verbal warnings.

26. Plaintiff disputed Jim Pivo's Performance Review by drafting a letter of explanation and requesting that it be placed in his employee file. Pivo assured Plaintiff that he

5

would send it to Human Resources to have it placed in the file. He did not do so and gave no reason for failing to do so.

27. In March, 2012, the Plaintiff's Local Sales Department exceeded their year-to-date goals. In April 2012, Plaintiff and his team raised concerns about Alex Helton's team members making sales calls in the territory assigned to Plaintiff and his team. Plaintiff expressed concern on behalf of three (3) sales representatives who had been affected by Helton's team making these calls and then splitting the sales. Pivo did not respond.

28. Plaintiff interviewed for a job with another department. After a less qualified candidate was hired, several white males questioned that department's hiring decision. Plaintiff also questioned the hiring decision, but was given a written reprimand for doing so. The white males were given no reprimands.

29. In September of 2012, Pivo reassigned one of Plaintiff's top performing sales representatives to his own team, taking the representative's sales credits with him. By the end of the month, Plaintiff had lost credit for two sales representatives that had 100% year-to-date performance ratings, and one sales representative that had a 278% year-to-date performance rating. Plaintiff had trained all three of these sales representatives and their transfer equated to losing credit for their year-to-date performance. By the end of 2012, Plaintiff lost an additional sales representative who was also a 100% year-to-date performer. Despite these loses, Plaintiff's team still finished the year at over 100 percent year-to-date ratings, and with a higher percentage than Alex Helton's team.

30. In October of 2012, it was announced that Fleet One had been sold to WEX, Inc. Around the middle of October, Pivo escorted Plaintiff to the office of the Group Vice President, David Rewers. Lori Vendl, the Human Resources Vice President, was also present. Although the Defendant confirmed that Plaintiff had met his number quotas, Plaintiff was given a written reprimand for not meeting his "performance" standards. The Defendant's purported reason regarded Plaintiff's email communications, which were not part of any performance standard.

31. The Defendant held an award presentation for employees who had completed a "Wexcellence" training course. Each participant received an award. The Defendant let each participant chose another employee to present. Plaintiff was not chosen. An employee named Tom Wagner presented Plaintiff by default. Wagner then made a "joke" that mocked Plaintiff's age and his hairstyle, the import and context of which raised negative connotations of Plaintiff's race and age. Pivo, Alex Helton, and other members of management were present and laughed.

32. In December 2012, Plaintiff completed the reviews for his team members, scoring them all "5's" on their communications ratings, and sent them to Pivo. There is no uniform method for scoring a team member. Unlike the other Team Leads, Pivo demanded examples of Plaintiff's team's communication skills. Plaintiff gave examples, but this was not good enough. Plaintiff had his sales representatives return examples of their communications skills, but this too was not enough.

33. Plaintiff reached out to John Tynan, the WEX Director of Human Resources, and told him of the disparate treatment that he was facing from Pivo and his favoritism toward Alex Helton.

34. Despite the negative treatment, by the end of the 2012 year, the Plaintiff's department had the highest sales of any department in Fleet One history, but Plaintiff was never recognized for this accomplishment.

## PROTECTED ACTIVITY

35. Plaintiff discovered that the Defendant had surreptitiously placed written reprimands in his employee file, contrary to company policy. The documents included, *inter alia*, written verification of "verbal warnings" that had never taken place, and a "final written warning" in which Plaintiff was unaware. The Defendant had been building a file against Plaintiff to use as grounds for his termination.

36. On January 4, 2013, after Plaintiff discovered that the Defendant had surreptitiously placed written reprimands in his employee file, and that a reprimand that the Defendant promised to remove was still in his file, Plaintiff filed a charge with the EEOC for discriminatory practices based on Plaintiff's age and race.

37. The Defendant lead Plaintiff to believe that the matter was settled and that the written reprimand had been removed. The parties agreed that if the Defendant removed the baseless write-up in Plaintiff's file then the Plaintiff would withdraw the EEOC charge.

38. On February 10, 2013, Plaintiff received a letter from the EEOC confirming this agreement.

## PRETEXT

39. In February 2013, Plaintiff challenged the written reprimands, and reached out to John Tynan, the WEX Director of Human Resources. Tynan had promised to have

8

the 2012 reprimand from Jim Pivo removed from Plaintiff's file. Tynan gave Plaintiff the original reprimand, but a copy of the reprimand was nonetheless retained in his file.

40. In February 2013, the Defendant put in place a series of "Rules of Engagement" for the Local Sales Department in which Plaintiff was in charge. The rules targeted the very successful strategies that Plaintiff had previously employed.

41. In March 2013, employees received a notice from Human Resources requesting that all sales representatives write a review of their managers. All of Plaintiff's sales representatives wrote a review, and Plaintiff requested to see those results. Plaintiff's request was denied.

42. In April 2013, the defendant continued to hire new employees and promote others.

43. In May 2013, one of Plaintiff's sales representatives, Matthew Hall, won the "Wexcellence Award for Outstanding Performance." Alex Helton had been nominated for the award, and was upset that she did not receive it.

44. In June or July 2013, Plaintiff discovered that Alex Helton's team had been receiving all of the split leads from the On The Road ("OTR") department, which department consisted of the larger trucks that remain away from their home base for extended periods of time. This resulted in artificial inflation of Helton's team's numbers for her performance rating, as well as her team's performance rating, and was used as a basis for Plaintiff's subsequent termination.

45. On July 8, 2013, Plaintiff requested to view his personnel file from the onsite Human Resources assistant. Plaintiff discovered that a copy of the original written reprimand that John Tynan had promised to remove was still in his file.

9

Additionally, Plaintiff discovered documented verbal warnings that were alleged to have occurred prior to Plaintiff's written reprimand in October of 2012, but that had never taken place. The Defendant never disclosed these documents to Plaintiff prior to placing them in his employee file.

46. On July 10, 2013, Plaintiff requested a complete copy of his file. The request was denied. Instead, Roger Rettke, the onsite Human Resources Manager tore up the documents in Plaintiff's presence.

47. Plaintiff contacted Chris Wing of the EEOC regarding the destruction of documents in his file, and Mr. Wing attempted to make contact with the Defendant's legal department. The Defendant did not reply.

48. Following the Plaintiff's contact with Mr. Wing of the EEOC, Jim Pivo increased the closed-door meetings he had with Alex Helton. Pivo started locking his door when he was away from his office.

49. On July 19, 2013, Plaintiff received a written reprimand for responding to an email communication directed at one of his sales representatives. The white employee that initiated the email in the other department was not given a reprimand.

50. Jim Pivo continued to have closed-door meetings with Alex Helton and excluded Plaintiff. Plaintiff confronted them with an email. Pivo did not reply.

51. Throughout July 2013, the Plaintiff's team continued to excel in their performance and exceeded their number quotas. Ms. Helton's team was under their 100% year-to-date quota as of the end of July 2013.

52. In August 2013, Plaintiff sent another email to Pivo about his closed-door meetings with Alex Helton, and Pivo did not respond.

53. Pivo came to Plaintiff's desk and informed him of an opportunity to go the headquarters in Portland, Maine for several days for a tour of the building and networking opportunities. He gave Plaintiff forty-five (45) minutes to make a decision, but knew that the Plaintiff had an autistic child that would require accommodations and more advanced notice. Pivo gave Alex Helton advanced notice. Pivo told Plaintiff that his ticket would be approximately $850.00 and he would have to put it on his own credit card. The same day, Jim Pivo offered Ms. Helton a ticket for $500.00, and said he was going to put it on his corporate credit card.

54. By August 2013, Plaintiff was the only inside salesperson in the history of the company to increase sales numbers and gallons sold in the State of Kentucky. In terms of gallons and sales, Plaintiff was the most successful Inside Sales Manager in the history of the company. Plaintiff's training and leadership lead to the most 100% performers in the company. Plaintiff was the most successful Team Lead in producing fuel gallon volume growth.

55. At the end of August, 2013, Plaintiff interviewed for a higher position within the company. Plaintiff was qualified for this position. After interviewing with Jeff Stuck, Plaintiff received an email for a second interview with Bill Cooper. Plaintiff completed the second interview with Bill Cooper on September 16, 2013. Plaintiff was selected as a final candidate for this position.

## ADVERSE JOB ACTION

56. Plaintiff arrived to work on September 17, 2013, and found that Defendant had locked him out of his computer. Other employees who were purportedly subject to the Defendant's reduction in force ("RIF") were not locked out of their computers.

57. John Tynan then requested Plaintiff's presence in the conference room, where Jim Pivo's superior, Justine Libby, was awaiting. Plaintiff was the first person called. They explained that the company was reducing the number of employees pursuant to a reduction in force, and that they were keeping Alex Helton, but not Plaintiff.

58. The Defendant's purported reason for retaining Helton was that she had more tenure in a management role, as well as higher performance scores than the Plaintiff. The Defendant used the fraudulent low scores that Jim Pivo had been giving Plaintiff as the basis for this decision.

59. The Defendant sent a group email indicating that Plaintiff was not to be let back into the building. No other employees that were subject to the reduction in force were specifically named in an email for such exclusion.

60. The Defendant allowed other employees to box up their personal belongings from their desks. Plaintiff was the only employee denied this opportunity. Some time later, one of his colleagues arrived early to box up his belongings and then met him at a Walgreens store down the street.

61. The Defendant subsequently retitled the "Team Lead" position as "Quality Analyst." Although the Defendant used "tenure" to terminate the Plaintiff, the Defendant allowed an employee with only four (4) years of tenure to transfer

12

immediately to the Quality Analyst position without reapplying. Plaintiff had seven (7) years tenure at that point.

62. The Defendant terminated three (3) Outside Sales Reps, one of which had twenty (20) years of tenure. All three (3) well over the age of forty (40). Tenure was used as a pretext in selecting Plaintiff for the reduction in force.

63. Plaintiff's negative performance evaluations were a pretext for his termination.

64. The Defendant prepared severance packages to employees that were affected by the RIF, but told most of the employees to not sign the documents and to return in forty-eight (48) hours.

65. Of the twenty (20) or more employees that were supposedly terminated, most came back within that 48-hour period and retained their jobs.

66. Of the twenty (20) or more that were handed severance packages, Jim Pivo told the employees that only Reginald Craig was not to be let back into the building. An email was sent around the building expressly mentioning that Reginald Craig was not to be let into the building. No other employees were treated in this shabby manner.

67. Other employees purportedly affected by the RIF were allowed to gather their belongings from their desk.

68. Prior to the reduction in force, Defendant held back sales leads and then released them to Pivo and Ms. Helton, so their numbers and performance ratings would inflate.

13

# CAUSES OF ACTION

## I. Violation of Title VII of the Civil Rights Act of 1964

69. Plaintiff is an African-American male and therefore a member of the class protected under Title VII.

70. Plaintiff was qualified for the job in which he performed, and was the only African-American sales manager in the history of Fleet One.

71. The Defendant treated Plaintiff differently than similarly situated white employees and then used the fraudulent low scores that Jim Pivo had been giving Plaintiff as a basis for their decision to terminate him.

72. Plaintiff was terminated pursuant to a purported reduction in force, while retaining Alex Helton, a white woman. The Defendant's actions were a pretext for an unlawful discriminatory motive.

73. The Defendant, through its managing agents, terminated Plaintiff's employment because of his race and color. This treatment which was based upon Plaintiff's race and color violated 42 U.S.C. § 2000e *et seq*.

74. As a result of Defendant's unlawful actions, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial. Plaintiff therefore is entitled to such affirmative relief as may be appropriate under 42 U.S.C. § 2000e-5(g).

## II. Unlawful Retaliation under Title VII

75. Plaintiff is an African-American male and is therefore a member of the group protected under Title VII.

76. The Defendant terminated Plaintiff's employment because of Plaintiff's involvement in activity protected under Title VII as shown by Plaintiff's filing of an EEOC charge alleging, *inter alia*, racial discrimination on January 4, 2013. Defendant's termination of Plaintiff in retaliation for his involvement in protected activity is an unlawful employment practice under 42 U.S.C. § 2000e-3(a).

77. The Defendant's proffered reason for termination, the "reduction in force," was a pretext to cover their unlawful, retaliatory motive for terminating Plaintiff.

78. As a result of Defendant's unlawful actions, Plaintiff has been deprived of all the benefits and privileges of employment in an amount to be established at trial. Plaintiff therefore is entitled to such affirmative relief as may be appropriate under 42 U.S.C. § 2000e-5(g).

### III. Violation of the Age Discrimination in Employment Act ("ADEA")

79. Plaintiff is fifty-four (54) years of age and is therefore a member of the group protected by the Act.

80. The Plaintiff was qualified for the job in which he performed.

81. Under the guise of a reduction in force, the Defendant terminated Plaintiff but retained Alex Helton, a white woman much younger than Plaintiff and not a member of the group protected by the Act.

82. The Defendant's purported reason for keeping Helton is that she had more tenure than Plaintiff and that she had a better performance rating.

83. The Defendant terminated three (3) Outside Sales Reps, one of which had twenty (20) years of tenure. All three (3) were well over the age of forty (40). Tenure was used as a pretext in selecting Plaintiff for the reduction in force.

15

84. Plaintiff's age was the motivating factor in Defendant's decision to terminate him pursuant to the reduction in force and is unlawful under the ADEA, 29 U.S.C. § 623.

85. As a direct and proximate result of the Defendants unlawful actions, Plaintiff has sustained financial losses and suffered emotional harm for which he is entitled to recover.

### IV. Unlawful Retaliation under the ADEA

86. Plaintiff is fifty-four (54) years of age and is therefore a member of the group protected by the Act.

87. Plaintiff filed an EEOC charge on January 4, 2013, alleging, *inter alia*, that the Defendant engaged in unlawful discriminatory practices based on Plaintiff's age.

88. The Defendant violated the Age Discrimination Employment Act of 1967 by retaliating against Plaintiff for filing an age discrimination claim with the EEOC against the Defendant on January 4, 2013.

89. Pursuant to the Defendant's purported "reduction in force," the Defendant employer took an action that adversely affected the Plaintiff by terminating his employment on September 17, 2013.

90. The "reduction in force" was a pretext for terminating the Plaintiff in retaliation for his filing an EEOC charge alleging discrimination based on Plaintiff's age.

91. Other employees that were purportedly terminated pursuant to the RIF were instructed to return in 48 hours and to not sign their severance packages. These employees were ultimately retained.

92. The Defendant told Plaintiff that Alex Helton was being retained because she had more tenure. However, three Outside Sales Reps, all of which exceeded the age of

40, were terminated, some of which had nearly twenty (20) years of tenure. The Defendant's use of "tenure" to retain Alex Helton over Plaintiff was a pretext for his termination.

93. As a direct and proximate result of this retaliation for filing an age discrimination claim with the EEOC, Plaintiff has sustained financial losses and suffered emotional harm for which he is entitled to recover.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant relief including, but not limited to the following:

1. That summons issue in accordance with the law and that the summons and complaint be served upon the Defendant;

2. Entry of judgment in favor of the Plaintiff for back pay, lost benefits, and any other equitable relief this Court deems just and appropriate;

3. Entry of judgment in favor of the Plaintiff for all taxable and nontaxable costs of this action, including any appeal;

4. Entry of judgment in favor of the Plaintiff for reasonable attorney's fees incurred in prosecution of this action;

5. Entry of judgment in favor of Plaintiff for prejudgment interest;

6. Order such other and further relief, as the Court deems just and appropriate;

7. The Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ W. Gary Blackburn
W. Gary Blackburn #3484
The Blackburn Firm, PLLC.
213 Fifth Avenue North, Suite 300
Nashville, Tennessee 37219
Phone: (615)-254-7770
Fax: (866) 895-7272
gblackburn@wgaryblackburn.com